IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ROBERT CHENCINSKI, #B75433, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-cv-485-RJD |
| | ) | |
| PERCY MYERS, M.D., WEXFORD HEALTH SOURCES, INC., SCOTT THOMPSON, and ILLINOIS DEPARTMENT OF CORRECTIONS, | ) ) ) ) | |
| | ) | |
|     Defendants. | ) | |

**ORDER**

**DALY, Magistrate Judge:**

Plaintiff, an inmate of the IDOC, filed this suit pursuant to 42 U.S.C. §1983. He alleges that Dr. Myers, Warden Scott Thompson (in his official capacity only), Wexford (a company that provides medical care to prisoners incarcerated within the IDOC) and IDOC violated his rights under the Eighth Amendment, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101 *et seq*., and the Rehabilitation Act, 29 U.S.C. §§794-94e.1 ("RA"). Plaintiff has blepharospasm, a chronic neurological condition involving involuntary muscle spasms around the eye. He also alleges that he suffers from seizures and needed crowns to fix his broken teeth. After the issue of administrative remedy exhaustion was resolved, Plaintiff's case proceeded on the following claims:

> Count 1: Eighth Amendment claim against Myers and Wexford for deliberate indifference to Plaintiff's blepharospasm, a serious medical need;
>
> Count 2: Eighth Amendment claim against Thompson for deliberate indifference to Plaintiff's serious dental needs;
>
> Count 3: ADA and Rehabilitation Act claim against IDOC and Thompson for

        failure to provide Plaintiff a low-gallery and low-bunk permit.

   Count 6:   Eighth Amendment claim against Dr. Myers for deliberate indifference to Plaintiff's seizures, a serious medical need.

   Discovery on the merits of Plaintiff's claims is finished, and this matter now comes before the Court on Defendants' Motions for Summary Judgment (Docs. 152, 153, 156, 157).  Plaintiff filed Responses (Docs. 158 and 159).  Defendants Myers and Wexford Health Sources, Inc. ("Wexford") filed Replies  (Docs. 163, 164, 165-1, 166).

## Material Facts

   Plaintiff transferred from a county jail to IDOC in September 2018.  Doc. 153-1, p. 22. He was incarcerated at Pinckneyville from November 2018-December 2021.  *Id*., p. 23.

***Blepharospasm treatment***

   Plaintiff participated in a medical history interview at the Northern Reception Center on September 18, 2018.  Doc. 153-4, p. 2.  According to the paperwork completed during Plaintiff's entrance physical exam, Plaintiff was diagnosed with blepharospasm in his left eye in 2007 and treated with Botox injections in his upper and lower eye lid.  Doc. 153-4, p. 4.  He had last received injections on August 22, 2018.  *Id*.  Plaintiff reported that he received injections every ninety days.  *Id*.  Plaintiff testified that when the Botox "wears off" after approximately 75 days he has "uncontrollable spasms that kind of pulls my whole face, my eye and my mouth."  Doc. 153-1, p. 142-43.  The spasms are painful at times and cause him to bite his cheeks, lips, and tongue.  *Id*., p. 142.

   Plaintiff saw a physician in the Department of Opthalmology Oculoplastics at the University of Illinois Chicago ("UIC") on October 23, 2018.  Doc. 153-4, p. 42-46.  The physician noted "next available for Botox."  *Id*., p. 46.  Plaintiff received a Botox injection at

UIC on November 13, 2018.  *Id*., p. 63.

Plaintiff transferred to Pinckneyville Correctional Center ("Pinckneyville") on or around December 4, 2018.  Doc. 153-4, p. 10.  Plaintiff's "Health Status Transfer Summary" states "f/u botox inject in 3 months left eye last given 11/18."  *Id*.  Dr. Myers is the Medical Director at Pinckneyville, a position he has held since June 2018.  Doc. 153-2, ¶3.  On December 19, 2018, Dr. Myers "noted in Plaintiff's chart that [he] submitted the collegial review referral for the Botox injection." *Id*., ¶13.[1]  On December 27, 2018, a staff member wrote "pt approved in collegial for possible Botox at Marion Eye Center scheduled on 2-28-19" in Plaintiff's chart.  Doc. 153-4, p. 12.

Plaintiff saw Dr. Myers for the first time on January 31, 2019.  Doc. 153-2, ¶17.  Plaintiff requested Botox injections, and Dr. Myers informed him that he was scheduled for an offsite ophthalmology appointment.  *Id*.  Plaintiff received Botox injections at the Marion Eye Center on February 28, 2019.  For the following year, Plaintiff received Botox injections approximately every 90 days.  Doc. 153-4, p. 70, 74, 78, 111, 146.  On one occasion, Plaintiff waited 102 days in between injections; on two other occasions, he waited less than 90 days between injections.  Plaintiff received the injections from Dr. Ukeme Umana at the Marion Eye Center.  For each visit, the treatment record states "RTC in 3 months for Botox injection OS with Dr. Umana."  Doc. 153-4, p. 71, 74, 79, 111.[2]  On multiple occasions, Plaintiff reported to Dr. Umana that the spasms were painful.  Doc. 153-4, p. 74, 78, 109.  On July 26, 2019, Dr. Myers asked the Medical

---

[1] The "'collegial review process' requires an off-site Wexford physician to review and approve an on-site physician's recommendation that an incarcerated person be referred to an off-site healthcare provider.'"  Howell v. Wexford Health Sources, Inc. 987 F.3d 647, 651 (7th Cir. 2021).

[2] Both Plaintiff and Defendants Wexford and Myers refer to a February 27, 2020 visit to the Marion Eye Center in their "Material Facts" sections.  However, there is no MEC treatment record in the materials submitted by Defendant for 2-27-2020 visit. There is a note dated February 27, 2020 in Plaintiff's chart that appears to be in Dr. Myers' handwriting and states "post-MEC Botox injection", but is otherwise illegible.  Doc. 153-4, p. 146.

Records Department at Pinckneyville to obtain Plaintiff's records from the Wheaton Eye Clinic, where he had previously received Botox injections. Doc. 153-2, ¶28. In August 2019, Plaintiff reported to Dr. Umana that he felt "like the last injection three months ago did not help at all." Doc. 153-4, p. 78. When Plaintiff returned from each appointment, Dr. Myers submitted a collegial review referral for the next appointment. Doc. 153-3, ¶¶20, 23, 30. 36

On January 13, 2020, Plaintiff saw Dr. Lars Gentry, an optometrist at Pinckneyville. Doc. 153-2, ¶43; Doc. 153-4, p. 36, 118.[3] Dr. Lars noted "referred to MEC for Botox injection. He needs them every 60 days, follow up about 2 weeks after procedures." *Id*.

In June 2020, staff at Pinckneyville made several notes in Plaintiff's records, indicating that the Marion Eye Center was not accepting patients who lived in a group setting. Doc. 153-4, pp. 152, 153, 155. Dr. Myers states in his declaration that "[d]uring the COVID-19 pandemic, there were several offsite providers that were reluctant or refused to treat patients in a group living setting, such as a nursing home or prison." Doc. 153-2, ¶54. Dr. Myers saw Plaintiff on June 16, 2020, and observed that Plaintiff's left eye was partially shut. Doc. 153-4, p. 156. Dr. Myers noted that staff "would request an in-hospital injection" and that Plaintiff would be provided with Naproxen, 500 milligrams to be taken twice daily for four weeks and a low bunk permit for six weeks. Doc. 153-4, p. 156. Plaintiff received a Botox injection on June 23, 2020. Doc. 153-4, p. 157.

On July 28, 2020, Plaintiff informed a nurse that at his most recent Botox injection, the doctor did not inject his eye-lid. Two days later, Plaintiff saw Dr. Myers and told him that the

---

[3] Dr. Lars' note appears to be dated January 13, 2021, not 2020. Doc. 153-4, p. 36. However, his corresponding exam worksheet is dated January 13, 2020 (Id., p. 118) and the note (p. 36) is placed among other January 2020 records.

June 23, 2020 injection was not "done this time like it was done the previous times." Doc. 153-4, p. 163-64. Dr. Myers reviewed the injection report and observed that Plaintiff's pupil and ocular muscles were working. *Id*.; Doc. 153-2, ¶68. Dr. Myers noted that he would contact the Marion Eye Center and discuss Plaintiff's "complaint with the surgeon." *Id*. The record does not reflect whether Dr. Myers ever did so.

Plaintiff traveled to the MEC to see Dr. Umana for Botox injections on October 1, 2020 January 28, 2021. Doc. 153-4, p. 225, 242. At the October 1, 2020 visit, Dr. Umana noted that Plaintiff had "spasms that cause pain" and that he had been unable to open his left eye "all the way" for three months, "quality is worsening." *Id*., p. 223. At Plaintiff's subsequent visit in January 2021, Dr. Umana noted that "[p]atient denies pain" and did not mention Plaintiff's ability to open his left eye. *Id*., p. 240.

There are no additional records from the Marion Eye Center presented by any of the parties in their summary judgment briefing. Dr. Myers states in his Declaration that he saw Plaintiff on April 22, 2021 after Plaintiff had received a Botox injection at the Marion Eye Center, and Plaintiff does not dispute this statement. Doc. 153-2, ¶99; Doc. 158, ¶54.

***Plaintiff's requests for low bunk and low gallery permits and reports of seizures***

Plaintiff testified that at his IDOC entrance physical in September 2018, he told the interviewer that he had a history of seizures, but that he had not "been on seizure medication for a few years." Doc. 153-1, p. 34. The interviewer marked that Plaintiff had no past medical history of seizures. Doc. 153-4, p. 2. *Id*. The physician who examined Plaintiff noted that he suffered a gunshot wound to the head in 1991 and then wrote "no sx." *Id*., p. 3.

Following a trip to the Marion Eye Center on May 23, 2019 for a Botox injection, Plaintiff saw Dr. Myers and requested a low bunk and low gallery permit ("LB/LG permit"). Doc. 153-2,

¶23.  In his declaration, Dr. Myers provided the following statement regarding Plaintiff's request:

> Plaintiff requested a low bunk and low gallery permit and stated that he is able to see okay.  I reviewed Plaintiff's medical records from the MEC and it was noted that his uncorrected vision was great.  The MEC records reflected that Plaintiff has blepharospasm with no complaints of flashes, floaters, or double vision.  He also did not complain of any visual problems to the ophthalmologist and his uncorrected vision shows that there is no loss of visual acuity.  I also observed Plaintiff walk into a crowded room full of chairs and he was able to enter the room, zig zag around the room until he reached an empty chair and was able to pivot and sit down. When leaving the room, he exited the room without overturning or bumping any chairs.  Upon consideration of his good navigational skills, non-reporting any visual issues, and his good visual acuity, I did not believe that Plaintiff was physically challenged to qualify for a low bunk or low gallery permit.

*Id.*, ¶23; *see also* Doc. 153-4, p. 18-21.

Also in his declaration, Dr. Myers makes the following statements regarding low bunk and low gallery permits generally:

> At Pinckneyville, there are a finite number of low bunk or low gallery assignments for individuals in custody.  As Medical Director, I am provided criteria from the Illinois Department of corrections of what types of conditions qualify for low bunk or low gallery permits: (1) obese over 350 pounds; (2) seizures; (3) uses assistive devices or prosthetic limbs; (4) over 65 years old; and (5) hemi paralysis (stroke).  It is my understanding that the criteria for low bunk or low gallery permits are specific to each facility. Therefore, when an individual in custody is transferred to Pinckneyville, they are generally assessed by a physician, nurse practitioner, or physician assistant to determine whether they qualify for a low bunk or low gallery permit at Pinckneyville….If a patient does not fit the specific criteria provided by the Illinois Department of Corrections, but a physician, nurse practitioner, or physician assistant determines that a low bunk or low gallery permit is medically necessary, they can provide them.

*Id.*, ¶24.

Plaintiff saw a nurse on November 22, 2019 (three days before he traveled to Marion Eye Center for a Botox injection).  Doc. 153-4, p. 28-30.  Her notes reflect that he "hit [his right

elbow] on bed 3 days ago", reported that his elbow hurt when he extended it, and wanted a LB/LG for his vision impairment. *Id.*, p. 29-30. The nurse did not refer Plaintiff to a physician, but gave him ibuprofen for the elbow pain. *Id.*, p. 28-29.

After receiving the Botox injection on November 25, 2019, Plaintiff presented to a nurse at Pinckneyville eight days later, reporting that he had twisted his leg stepping off his bunk and was experiencing pain of 8 on a scale of 1-10. *Id.*, p. 32. Plaintiff saw Dr. Myers that same day; Dr. Myers determined that Plaintiff had a "muscle sprain" and issued him a permit for crutches and a LB/LG permit for two months, and prescribed muscle cream and Naproxen for pain. *Id.*, ¶38.

A nurse noted that Plaintiff requested a LB/LG on January 17, 2020. Doc. 153-4, p. 37. She circled "MD referral" on her note. *Id.* Plaintiff saw Nurse Practitioner Bob Blum on January 22 and 29, 2020 for follow-up visits regarding an ultrasound for an unrelated condition; no LB/LG permit was issued. *Id.*; Doc. 153-2, ¶¶45-46.

On April 1, 2020, a nurse noted that Plaintiff said "I had a seizure the other day." Doc. 153-4, p. 147. The nurse referred Plaintiff to the physician or nurse practitioner, and noted that she "instructed patient to notify health care unit at the time or after having" a seizure. *Id.*; Doc. 153-2, ¶49. Dr. Myers saw Plaintiff two days later. Doc. 153-2, ¶50. He reviewed Plaintiff's IDOC admissions paperwork, which did not indicate that Plaintiff mentioned a history of seizure disorder and there were no prescribed medications for seizures. *Id.* Dr. Myers "instructed Plaintiff to notify nursing or security staff if having a seizure." *Id.*

On May 27, 2020, Plaintiff saw a nurse and requested a LB/LG permit "for his vision." *Id.*, ¶52. The nurse referred Plaintiff to Dr. Myers, who denied Plaintiff's request. *Id.* Dr. Myers explained in his affidavit that "Plaintiff's vision was 20/20 in his right eye and 20/70 in his

left eye which indicates that he has normal vision in his right eye and correctable vision in the left eye. Plaintiff would be entitled to a low bunk and low gallery permit if he was visually impaired, which he is not." *Id*.

Dr. Myers saw Plaintiff on June 16, 2020. Doc. 153-2, ¶60. Plaintiff was nearly 30 days past due for a Botox injection, but could not be scheduled at the Marion Eye Center related to the COVID-19 pandemic. *Id*. Dr. Myers observed that Plaintiff's left eye was partially shut. *Id*. In addition to requesting an in-hospital Botox injection to treat Plaintiff's blepharospam, Dr. Myers also provided Plaintiff with a low bunk permit for six weeks. *Id*.

Plaintiff requested a renewal of his low bunk permit on July 28, 2020. Doc. 153-4, p. 162. Dr. Myers saw Plaintiff on July 30, 2020. *Id*., ¶68. Plaintiff reported to Dr. Myers that the most recent Botox injection was not done the same as previous injections, so [Plaintiff] is having spasms." *Id*., ¶68. Dr. Myers reviewed Plaintiff's injection reports and could see Plaintiff's "pupil and ocular muscles were working." *Id*. Dr. Myers explained to Plaintiff that he did not meet the criteria for a low bunk permit, and that he had issued Plaintiff the low bunk permit on June 16, 2020 because of the delay in receiving the Botox injection (related to the COVID-19 issues). *Id*.

On August 17 and 19, 2020, Plaintiff reported to a nurse that he had fallen from the top bunk and had right calf pain. Doc. 153-4, pp. 166, 167. Plaintiff received Ibuprofen and saw Dr. Myers on August 20, who noted "no clinical evidence of a residual injury." *Id*.; Doc. 153-2, ¶¶70-72.

Plaintiff saw the optometrist, Dr. Gentry, on August 24, 2020. Doc. 153-2, ¶74. Dr. Gentry "noted that Plaintiff needs a low bunk due to issues with depth perception." *Id*. Dr. Myers reviewed Dr. Gentry's recommendation, but determined that it was "not medically

necessary at that time" for Plaintiff to receive a LB/LG permit. *Id*.

On August 29, 2020, Dr. Myers sent Plaintiff to the emergency room for treatment of a "bleeding lesion" on his right ankle. *Id*., ¶76. Five days later, Dr. Myers examined Plaintiff's right ankle wound and observed that it was not swollen and the sutures were in place. Doc. 153-2, ¶77. Plaintiff requested a "low bunk due to the ankle repair" but Dr. Myers saw "no swelling, bruising, or wound drainage, so there was no medical need for a low bunk." *Id*.

Plaintiff underwent a routine Offender Medical History on September 23, 2020. *Id*., ¶79. According to the documentation, Plaintiff reported a history of "seizures or cerebral trauma" related to a gunshot wound in the head. Doc. 153-4, p. 140.

After Plaintiff returned from a Botox injection on October 1, 2020, Dr. Myers reviewed his treatment record, which included the following note from Dr. Umana:

> Patient has lid closure when the affect of Botox has worn off and patient has monoclonar vision at that time. He is unable to judge depth perception. He has experienced misjudging distance and resulting injuries due to this. Patient needs lower bunk, based on this I think that low bunk bed should be considered if this meets the Illinois Department of Corrections criteria.

Doc. 153-2, ¶81; Doc. 153-4, p. 222. Dr. Myers spoke with Dr. Umana and discussed "capabilities of a person with monoclonar vision…that outside of confinement, individuals with monocular can fully function, they can drive, work in industry, etc." Doc. 153-2, ¶81.

Plaintiff presented to a nurse on October 9, 2020, complaining of tailbone pain after falling off his bunk. Doc. 153-4, p. 185. Dr. Myers reviewed Plaintiff's chart on October 22, 2020 and "observed that this issue has been addressed repeatedly" and Plaintiff still did not qualify for a low bunk permit. Doc. 153-2, ¶64. Dr. Myers saw Plaintiff again on November 5, 2020, complaining of knee pain and again requesting a LB/LG permit. Doc. 153-2, ¶87. Dr. Myers observed that

Plaintiff had normal gait and was able to "mount and dismount from the examination table without difficulty." *Id*.

Plaintiff returned to the Emergency Room for a bleeding lesion to his right ankle on December 11, 2020. Plaintiff's discharge instructions from the ER state "low bunk, low gallery" and "no climbing." Doc. 153-4, p. 232. Dr. Myers ordered a LB/LG permit for seven days. Doc. 153-2, ¶88. Plaintiff underwent a "punch biopsy" on January 27, 2021.[4] *Id*., ¶89. The "provider" who performed the biopsy recommended that Plaintiff not climb for 24 hours; Dr. Myers provided Plaintiff with a low bunk permit for three days. *Id*.

On February 3, 2021, Plaintiff reported to a nurse that he had a seizure on January 30, and that this was his sixth seizure in the past two years. Doc. 153-4, p. 203. Plaintiff saw Dr. Myers the next day, reporting that his cellmate observed the seizure but they did not notify a corrections officer. Doc. 153-2, ¶93; Doc. 153-4, pp. 204-207. Plaintiff also reported that he did not know he had a seizure. Dr. Myers noted that "this offender is relentless in his efforts to obtain a low bunk, i.e., with an eye appointment, an ER visit, and a simple punch biopsy, etc." In his declaration, Dr. Myers describes the rest of the encounter:

> When I reminded him of whom to notify when having a seizure, he informed me that it was not his cellmate's responsibility to "determine his seizure activity." He also stated that it was my responsibility to obtain his old records, but I told him that I could not get his old records without his assistance due to HIPAA. I then explained to Plaintiff the procedures for requesting his old records. Plaintiff became more vocal, demanding that I get his old records and when he raised his voice, I informed him that the interview was over. At this time, I did not believe it was medically necessary to prescribe Plaintiff any medications for seizures or provide a low

---

[4] No further information is given from the parties regarding which area of Plaintiff's body was biopsied, but based upon the surrounding medical events it was presumably Plaintiff's ankle. A punch biopsy involves a "round-tipped cutting tool [] used to remove a small core of skin, including deeper layers." mayoclinic.org/tests-procedures/skin-biopsy/about (last accessed Aug. 10, 2024).

>       bunk permit as his alleged seizures had not been witnessed by any security or medical staff.

*Id*.   At the time of his deposition, Plaintiff was taking a medication for seizures.   Doc. 153-1, p. 10.

***Broken teeth***

On February 22, 2019, Plaintiff fell on his face while attempting to climb into his top bunk. Doc. 153-1, p. 94.   Two of his teeth were broken.   *Id*.   On March 27, 2019, Plaintiff saw Dr. Chapman (Pinckneyville's dentist) and they had a conversation about "ideally, [Plaintiff's broken teeth] needed to be crowned."   *Id*., pp. 99-100.   Dr. Chapman told Plaintiff that "per policy, [Wexford and IDOC] don't do crowns for prisoners."   *Id*., p. 100.   Instead of crowns, Plaintiff received fillings.   *Id*., p. 93.   The fillings fall out, sometimes less than 24 hours after they are placed.   *Id*., p. 102.

**Summary Judgment Standard**

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005).   The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact.   *Celotex*, 477 U.S. at 323.   Once a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).   A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at

248).  In considering a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party.  *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

### Eighth Amendment Claims

The Eighth Amendment "'does not mandate comfortable prisons,' but neither does it permit inhumane ones."  *Brown v. Osmundson*, 38 F. 4th 545, 559-60 (7th Cir. 2022) (internal citations omitted).  To succeed on his deliberate indifference claims against Defendants Myers and Thompson, Plaintiff must "provide evidence, either direct or circumstantial" that shows (1) "he had an objectively serious medical need" (2) "which [the defendant] "[knew] of and disregard[ded] a substantial risk of harm."  *Id*. at 550.  Negligence or even recklessness does not constitute deliberate indifference; the defendant must have shown "something approaching a total unconcern for the prisoner's welfare in the face of serious risks."  *Id*.

To prevail in his §1983 claim against Wexford, Plaintiff must establish that his Eighth Amendment right to be free from cruel and unusual punishment was violated by 1) Wexford's express policy; 2) Wexford's "widespread and persistent practice that amounted to a custom approaching the force of law"; or 3) a Wexford "official with final policymaking authority."  *Howell v. Wexford Health Sources, Inc*., 987 F.3d 647, 653-54 (7th Cir. 2021) (internal citations and quotations omitted).

**Count I**

Wexford and Dr. Myers do not contest the seriousness of Plaintiff's blepharospasm.  Instead, their arguments focus on the care Plaintiff received while at Pinckneyville, contending that no reasonable jury could find that the treatment Plaintiff received for his blepharospasm fell short of what the Eighth Amendment requires.  The Court agrees.

The Court assumes, for purposes of summary judgment, that Plaintiff was uncomfortable and at times in pain starting on the 75th day after his injections. The record reflects that Plaintiff received Botox injections approximately every 90 days while he was at Pinckneyville, as recommended and ordered by the ophthalmologist treating him at Marion Eye Center. No evidence in the record suggests that Plaintiff should have received his injections sooner than every 90 days. Certainly, there were instances where Plaintiff waited *more* than 90 days between injections. Plaintiff's first Botox injection at the Marion Eye Center was 107 days after his most recent injection. As the Seventh Circuit has explained, "delays are common in the prison setting with limited resources, and whether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016). In his declaration, Dr. Myers explained the appointment scheduling process:

> Once a referral is approved in Collegial Review, an authorization number is created by Wexford, and is provided to the onsite scheduler. At Pinckneyville, offsite appointments are generally scheduled by a staff assistant. To my recollection, we have sent numerous patients to MEC in the past and have an established relationship with that provider. Typically, patients are scheduled for the first appointment available (or within a particular treatment window timeframe). It is my understanding that the IDOC encourages scheduling multiple patients to be sent to the same provider on the same day for security logistics. It is also my understanding that the offsite providers encourage scheduling multiple patients to be sent to the same provider on the same day as they often set aside a portion of their day to treat incarcerated patients. There are not many offsite providers that can provide Botox injections for blepharospasm in a reasonable distance from Pinckneyville besides MEC. It is my understanding that the staff assistant scheduling Plaintiff's February 28, 2019 appointment at MEC took the first available appointment.

Doc. 153-2, ¶14.

This explanation reflects a reasonable approach to scheduling appointments for Plaintiff at

the Marion Eye Center, and Plaintiff fails to point the Court to any evidence from which a jury could infer that "something approaching a total unconcern for [Plaintiff's] welfare" led to Plaintiff waiting more than 90 days (at times) between injections. *See Brown,* 38 F. 4th at 550. Dr. Myers submitted timely collegial review referrals. While scheduling appointments was not one of his direct responsibilities, the Court infers that as the Medical Director, he could have intervened if healthcare staff was not making reasonable efforts to schedule Plaintiff's injections.[5] Dr. Myers' undisputed explanation of the considerations made when scheduling those appointments reflects that there were no "inexplicable[s] delays in treatment which served no penological interest" and therefore no Eighth Amendment violation *Petties*, 836 F.3d at 730.

Plaintiff contends that Dr. Myers should have ordered his records from the Wheaton Eye Clinic prior to July 2019. At that point, Plaintiff had been at Pinckneyville for approximately eight months. Plaintiff does not provide the Court with any explanation or evidence regarding the importance of the Wheaton Eye clinic records. For example, while Plaintiff complained that his May 2019 injection did not seem "to help at all", the record is silent as to whether Dr. Umana would have performed the injection differently if he had seen Plaintiff's previous records. Without evidence to demonstrate why the records were important, the Court cannot infer that Dr. Myers disregarded a substantial risk of harm to Plaintiff's health by not ordering them sooner.

Nor is the Court convinced that Dr. Myers' refusal to issue Plaintiff a low bunk or low gallery permit is evidence that he treated Plaintiff's blepharospasm with deliberate indifference. The record reflects that on multiple occasions, Dr. Myers considered whether Plaintiff qualified

---

[5]That Dr. Myers directed staff to arrange for Plaintiff's injection at the hospital in June 2020 when Dr. Umana could not treat Plaintiff at the MEC office reflects that Dr. Myers did not choose "easier and less efficacious treatment" in violation of the Eighth Amendment. *Lockett v. Benson*, 937 F.3d 1016, 1024 (7th Cir. 2019).

Page **14** of **19**

for such a permit and concluded that he did not, based on his observations, experience, and IDOC requirements.  Other medical professionals recommended the permits, but a difference of opinion "does not automatically give rise to a constitutional violation." *Id*.  Dr. Myers weighed the recommendations by the other doctors, and his considerations reflect that he exercised medical judgment as opposed to simply disregarding the risk Plaintiff faced by climbing on to the top bunk. For example, Dr. Umana noted that Plaintiff needed a low bunk permit for times when he could only see out of one eye ("monoclonar vision"); Dr. Myers spoke with Dr. Umana about this issue, and they discussed the capabilities of people with monoclonar vision.  The undisputed evidence also reflects that when Plaintiff faced an additional hurdle to climbing the top bunk, e.g., foot injury, Dr. Myers ordered him a temporary low bunk permit.

As for Wexford, Plaintiff contends that the evidence permits the inference that "Wexford had a policy that prioritized cost-saving over inmates' health" that resulted in Plaintiff receiving untimely Botox injections.  There is no evidence in the record to support this vague assertion.  As explained above, Dr. Myers' declaration reflects that healthcare staff at Pinckneyville took a reasonable approach to scheduling inmates' off-site appointments.  Even if it was unreasonable, Wexford submitted an affidavit from its "Director of Risk Management, HIPAA compliance, and Legal Affairs", who informs the Court that "Wexford would pay the same amount for Plaintiff to see an outside specialist no matter the date he was seen" and that Wexford does not pay transportation or security costs.  Doc. 153-3, ¶10.  Of course, if Wexford only sent Plaintiff for Botox injections three times a year (instead of four), the Court infers that Wexford would save money.  There is no evidence in the record regarding the amount of money Wexford spent on Plaintiff's Botox injections in 2019 (when he traveled to the Marion Eye Center four times for injections) versus 2020 (when he only had three injections but one was at a hospital).  Because

Page **15** of **19**

Plaintiff has failed to point to any evidence that reflects Wexford had a policy or practice that violated his Eighth Amendment rights at Pinckneyville, summary judgment is appropriate in favor of Wexford on Count I.

**Count II**

Plaintiff alleges that Defendant Thompson was deliberately indifferent to Plaintiff's dental needs, but there is no evidence in the record that Defendant Thompson, the Warden at Pinckneyville, had any role in Plaintiff's dental treatment. Plaintiff points to the statement made by the dentist at Pinckneyville, that "ideally, [Plaintiff's broken teeth] needed to be crowned" but Wexford and IDOC "don't do crowns for prisoners." Assuming this policy exists, there is no evidence that attributes it to Defendant Thompson.[6] Plaintiff also testified that he had to wait a month before his broken teeth were filled and that his fillings fell out multiple times, but he fails to point to evidence suggesting that Defendant Thompson was even aware of Plaintiff's dental issues. Because no evidence reflects that Defendant Thompson disregarded a substantial risk of harm to Plaintiff, summary judgment is appropriate in favor of Defendant Thompson on Count II.

**Count VI**

Dr. Myers saw Plaintiff in April 2020 after a nurse noted that Plaintiff reported 'I had a seizure the other day." Dr. Myers reviewed his file, saw no history of seizures, and told Plaintiff to "notify nursing or security staff if having a seizure." Plaintiff understood that this instruction meant his cellmate was supposed to notify staff. Doc. 153-1, p. 59. Plaintiff then saw Dr. Myers again in February 2021 after having reported another seizure. In his Declaration and the medical records, Dr. Myers states that he attempted to explain the process of obtaining Plaintiff's medical

---

[6] Moreover, the Eighth Amendment does not mandate "ideal" treatment for prisoners. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal citations and quotations omitted).

Page **16** of **19**

records to Plaintiff (which involved Plaintiff's cooperation), and Plaintiff raised his voice and demanded that Dr. Myers obtain the old records. Dr. Myers then ended the visit, and did nothing further regarding Plaintiff's reported seizures.

Viewing this evidence in the light most favorable to Plaintiff, Dr. Myers' actions, at most, constitute two isolated instances of neglect over the course of a year. While he did not prescribe any treatment or tests for Plaintiff after either visit, he explained what Plaintiff needed to do to confirm that Plaintiff either had a history of seizures or was currently having seizures at Pinckneyville. Certainly, the jury could infer that Dr. Myers thought Plaintiff's reports of seizures were simply another attempt to obtain a bottom bunk; Plaintiff testified that he is currently taking anti-seizure medication, so the jury could also infer that Dr. Myers was mistaken. However, Dr. Myers' assessment and "decision to forego diagnostic tests" can only be considered deliberate indifference if it is "blatantly inappropriate." *Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014). Without Plaintiff's cooperation in obtaining prior medical records-or his cellmate alerting a staff member as a seizure was happening-Dr. Myers' decision to forego diagnostic tests or prescribe Plaintiff treatment for seizures is not so "blatantly inappropriate" as to constitute an Eighth Amendment violation. Accordingly, summary judgment is granted in favor of Dr. Myers on Count Six.

### ADA/RA Claim

In Count III, Plaintiff contends that his rights under the Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA") were violated at Pinckneyville because he did not have a permanent low bunk permit. The ADA and RA protect individuals with disabilities from discrimination; the two statutes are "materially identical." *A. H. by Holzmuller v. Illinois High School Ass'n*, 881 F.3d 587, 591 (7th Cir. 2018). Under the ADA/RA, Plaintiff can obtain

injunctive relief and compensatory damages. *Lacy v. Cook Cty.*, 897 F.3d 847, 862 (7th Cir. 2018). However, to obtain compensatory damages, Plaintiff must establish that prison staff was deliberately indifferent to his need for a low bunk permit. *Id*. Dr. Myers is the only individual that Plaintiff alleges acted with deliberate indifference in regards to the low bunk permit. As explained above, the record reflects that no reasonable jury could find that Dr. Myers disregarded a substantial risk of harm when he denied Plaintiff's requests for a low bunk permit.

As for Plaintiff's request for injunctive relief, Defendant Thompson contends that it is moot because Plaintiff is no longer incarcerated within the IDOC. Plaintiff does not address this argument, or any other argument made by Defendant Thompson in his Motion for Summary Judgment regarding Plaintiff's ADA/RA claim. Plaintiff transferred from Pinckneyville to Western Illinois Correctional Center in December 2021; he was issued a low bunk permit at Western. Doc. 153-1, p. 55. He later transferred to Stateville, where he also received a low bunk permit. *Id*., p. 22, 119. The Court recognizes that an exception to the mootness doctrine is where an alleged violation is "capable of repetition yet evading review." *Gill v. Linnabary*, 63 F. 4th 609, 613 (7th Cir. 2023). Plaintiff has not raised this argument and the Court has no basis to find that he is at risk of being without a low bunk permit even if he was still incarcerated. Accordingly, Plaintiff's claim for injunctive relief in Count IV is moot.

Because Plaintiff failed to establish that Dr. Myers was deliberately indifferent to his request for a low bunk permit, he cannot obtain compensatory damages in Count IV. His request for injunctive relief in Count IV is moot. Summary judgment is therefore appropriate on Count IV and the Court declines to address Defendant Thompson's remaining arguments.

## Conclusion

Defendants' Motions for Summary Judgment (Docs. 152 and 156) are GRANTED. This

case is dismissed with prejudice in its entirety.   The Clerk of Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED:   August 16, 2023**

*s/ Reona J. Daly*

**Hon. Reona J. Daly**
**United States Magistrate Judge**